# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

FRANKIE SCOTT                          :
                                       :
    Plaintiff,                   :
                                       :
                                       : CASE NO.: 1:15-CV-49 (WLS)
v.                                     :
                                       :
TARGET CONTAINER COMPANY               :
                                       :
    Defendant.                   :
_____         :

## **ORDER**

Before the Court are dueling motions for summary judgment. First is Defendant Target Container Company's Motion, filed September 12, 2016. (Doc. 41.) Plaintiff Frankie Scott filed a response on October 4, 2016. (Doc. 46.) Target replied on October 17, 2016. (Doc. 47.) The motion is now ripe for review. Second is Plaintiff's Motion, filed September 13, 2016. (Doc. 43.) Target filed a response on October 3, 2016. (Doc. 44.) Scott failed to file a reply and his opportunity to do so has expired. *See* M.D. Ga. L.R. 7.3. Scott's motion is also ripe for review. The Court will address each motion individually.

## I.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable

substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322–24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsuhita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form"). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II. Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. Here, Scott and Target both filed statements of undisputed facts. (Docs. 41-2; 43-2.) Both Parties filed the appropriate response (Docs. 44-1; 46-1) and their own statements of disputed material facts (Docs. 44-2; 46-2). Scott responded to many of Target's facts by claiming the statement was "[d]isputed" because it was "immaterial and irrelevant." (Doc. 46-1 at ¶¶ 63; 65–87.) The response does not "specifically[] controvert[]" the factual allegations made by Target. Accordingly, to the extent Target's statements are relevant, the Court will deem them admitted unless otherwise inappropriate.

Having established the applicable standards, the Court will proceed to the facts. Any facts included in the analysis section rather than in the factual background were still found using the applicable standards; the organization is for ease of reading only.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. Relevant Factual Background

### A. Scott's Employment with Target

Defendant Target Container Company—true to its name—is a company in the business of manufacturing corrugated boxes. (Doc. 46-1 at ¶ 1.) It owns a plant in Albany, Georgia where Plaintiff Frankie Scott was hired in or around June of 2005. (*Id.* at ¶¶ 1–2.) Scott was originally hired as a bailer, a position in which he recycled scrap corrugated board pieces, but later became a "helper" on the 86" rotary printing press. (*Id.* at ¶¶ 3–4.) The machine is operated by two employees. (Doc. 46-6.) The first, the helper, is solely responsible for setting up the press's feed. (*Id.*) The second, the operator, generally prepares the machine and operates the run process. (*Id.*) Both watch for problems while the machine runs and shut it down afterward. (*Id.*) The operator runs a test box before each order and

3

performs random quality checks throughout the process. (Doc. 46-1 at ¶¶ 7–8.) If a box is produced inconsistent with the customer's order, the operator is held responsible. (Doc. 41-2 at 71:6–13.)[1]

Scott was involved in a car accident in April 2008 which caused injuries to his left shoulder and neck. (Doc. 46-1 at ¶¶ 11–12.) The injuries are partially the basis for the disability he claims in this lawsuit. (*Id.* at ¶ 11.) Scott took two weeks off work to tend to his injuries and he was put on light duty when he returned. (Doc. 41-2 at 151:15–152:5.)

At some point, Scott was promoted to an operator of the 86" machine. (Doc. 46-1 at ¶ 14–15.) Target's records show the promotion occurred in July 2008, but Scott believes it was sometime before his April 2008 accident. (*Id.* at ¶¶ 14–15.) After the promotion, on August 4, 2008, Scott received a verbal warning for poor quality from supervisor Quinton Sims. (*Id.* at ¶ 16.) Scott committed another infraction the next day and was issued an Employee Warning Report by Sims. (*Id.* at ¶ 17.) In September 2008, Scott was suspended for failing to perform quality checks. (*Id.* at ¶ 19.) Scott does not dispute that he failed to perform the quality checks. (*Id.* at ¶ 20.)

From August through December 2008, Scott submitted documents supporting his medical absences from work. (*Id.* at ¶ 21.) There is no evidence that any of these documents indicated Scott needed any sort of accommodation while at work during that timeframe. (*Id.*)[2] On or around February 10, 2009, Scott saw a physician and provided documentation of the visit to Target. (*Id.* at ¶ 22.) There was a space for the physician to list any restrictions on Scott, but none were listed. (*Id.* at ¶ 23.) The note did not list the reason for Scott's visit. (*Id.* at ¶ 24.) Likewise, Scott submitted documentation for physician visits on February 16, 2009 and March 18, 2009. (*Id.* at ¶ 25.) Neither listed Scott's condition or listed any restrictions. (*Id.* at ¶ 26.)

---

[1] Scott asserts this fact is hearsay. (*See* Doc. 46-1 at ¶ 9.) It is unclear what the basis is for that claim. In his deposition, Scott was testifying to his personal knowledge of the supervisory structure of the organization for which he worked.

[2] Scott disputes this statement, citing a letter from a doctor at the Advanced Spinal Rehab Center saying Scott "is placed on Light Duty from 4/25/08 through 5/2/08." (Doc. 46-8.) The objection mischaracterizes Target's statement. Target claims that no evidence suggests Scott needed an accommodation *from August through December 2008*. (Doc. 46-1 at ¶ 21.) The letter cited by Scott is dated April 25, 2008 and does not suggest Scott needed to be accommodated during Target's stated timeframe. (Doc. 46-8.)

On or about March 23, 2009, Scott informed Target that he would need surgery on his right shoulder. (*Id.* at ¶ 27.) A little over a week later, on April 1, 2009, Target alleges Scott committed a quality infraction. (*Id.* at ¶ 28.) Another week later, on April 9, 2009, Scott saw a physician and provided Target with a note stating Scott could "return to normal duty with no restrictions." On April 23, 2009, Scott provided documentation of his need for surgery. (*Id.* at ¶ 30.) Scott's need for surgery at least partially related to the wear on his shoulder from his employment with Target, though Scott did not file a worker's compensation claim and none of the documents Scott submitted to Target suggested a work-related injury. (*Id.* at ¶¶ 31–33.)[3]

Scott was terminated on April 30, 2009 for allegedly failing to perform quality checks, though he disputes the basis for the termination because he was not shown the allegedly defective boxes. (Docs. 41-2 at 275; 46-1 at ¶ 35.) Gary Gilbert, a production manager at Target, told Scott at his termination hearing that he knew what the state of Scott's performance was since the car accident. (Doc. 46-1 at ¶ 37.) However, Gilbert never said anything negative about Scott's injuries. (*Id.* at ¶ 38.)

Scott received unemployment benefits from August 2009 through November 2011. (*Id.* at ¶ 42.) He was unable to work in early 2009 while getting medical attention for the rotator cuff tear, but worked 30–32 hours per week from August 2009 through June 2011 at Gibson Auto where he earned approximately $200 per week. (*Id.* at ¶¶ 44, 47.)[4] Scott invoked his right against self-incrimination when asked whether he reported this income to

---

[3] Scott objects to some of these facts, claiming it "[m]ischaracterizes the Plaintiff's testimony." (Doc. 46-1 at ¶¶ 31–32.) Scott's citations, however, do not support his objections. In fact, the citations bolster Target's claims. On page 144 of Scott's deposition, which is cited by Scott in one objection, Scott is describing how his day-to-day work exacerbated his rotator cuff injury—which was exactly the claim made by Target. (*Id.* at ¶ 31; Doc. 41-2 at 155.) On page 145, Scott confesses he did not file a worker's compensation claim and attempts to explain why. (Doc. 41-2 at 156.) Again, this supports Target's assertion that Scott did not file a worker's compensation claim. (Doc. 46-1 at ¶ 32.) In the future, Scott should explain *how* a defendant allegedly misconstrued his testimony rather than leave the Court to speculate.

[4] In response to paragraph forty-four of Target's statement of undisputed facts, Scott wrote—in its entirely—"Response:." (Doc. 46-1 at ¶ 44.) In response to paragraph forty-five, which makes similar allegations, Scott objected noting that he testified he could not remember how long he worked at Gibson Auto or what months he worked there. (Doc. 46-1 at ¶ 45.) Presumably he intended to make the same objection to paragraph forty-four. However, his lack of memory in no way disputes Target's evidence that he worked 30-32 hours from August 2009 through June 2011. (*See* Doc. 41-2 at 556.) Accordingly, there is no basis for an objection.

5

the Department of Labor. (Doc. 41-2 at 52:4–8.) The Department of Labor's records do not show any of Scott's income from Gibson. (Doc. 46-1 at ¶ 46.)

Scott worked a few other odd jobs after his separation from Target. He worked at Moses Janitorial in 2010 or 2011, with Atlantic Pallet Exchange in 2013, and at both Manpower Temp Agency and Family Dollar in 2014. (*Id.* at ¶¶ 49–51.) The full extent of his employment history is murky. Scott, citing his Fifth Amendment rights, refused to answer deposition questions about whether he earned income from a painting business, whether he was unable to work after being involved in a November 2010 automobile collision, and whether he worked while incarcerated. (*Id.* at ¶¶ 52–54.)

On May 5, 2009, Scott filed for disability benefits and claimed to have been disabled since April 30, 2009. (*Id.* at ¶ 57.) Scott testified under oath as part of those proceedings, but refused to answer questions about that testimony during his deposition. (*Id.* at ¶¶ 56, 58.) Scott signed his Equal Employment Opportunity Commission (EEOC) intake questionnaire on October 6, 2009, signed his charge of discrimination on December 3, 2009, and maintained his claim through December 15, 2011. (*Id.* at ¶¶ 59–61.) He invoked his Fifth Amendment rights when asked if he is able to work at all. (Doc. 41-2 at 128:7–9.)

An administrative law judge denied Scott's claim for disability benefits on December 15, 2011. (Doc. 47-2.) The judge concluded that "the record as a whole does not support [Scott's] allegations of totally incapacitating symptoms. His allegations are not fully credible and are out of proportion with the objective medical evidence." (*Id.* at 19.)

### B. Scott's Previous Car Accidents and Litigation

The remaining facts are all disputed by Scott as immaterial and irrelevant. (*See* Doc. 46-1 at ¶¶ 63, 65–87.) However, Scott does not dispute the substance of the alleged facts. Given that the record supports Target's factual allegations, the Court recounts the disputed testimony here and considers the relevance of the evidence, as needed, when applying the legal standards.

Following Scott's April 2008 car accident recounted above, he was involved in additional car accidents in early 2009, January 2010, February 2010, and November 2010. (*Id.* at ¶ 63.) Scott received a settlement related to the early 2009 accident. (*Id.* at ¶ 65.) The

November 2010 accident occurred when a Sanderson Farms truck driven by James Strum struck Scott. (*Id.* at ¶ 69.) Scott brought a lawsuit against Sanderson Farms, but during his deposition in this case invoked his Fifth Amendment rights when asked whether he lied about the nature and extent of his injuries in that accident. (*Id.* at ¶ 71.) In the Sanderson Farm action, Scott claimed he never had contact with Strum prior to the accident, but an earlier employment application of Scott's (written in Scott's handwriting) listed Strum as a reference and asserted Scott had known him for fifteen years. (*Id.* at ¶¶ 72–74.) Scott invoked his Fifth Amendment rights when asked about this seeming discrepancy. (*Id.* at ¶ 73.) The claim against Sanderson Farms was ultimately dismissed. (*Id.* at ¶ 75.)

In 2015, Scott pleaded guilty to insurance fraud. (*Id.* at ¶ 76.) He invoked his Fifth Amendment rights when asked generally about the conviction, whether it was related to the Sanderson Farms incident, and whether he served jail time. (*Id.* at ¶¶ 77, 78, 80.)

In all during his deposition, Scott invoked his Fifth Amendment privilege more than seventy-five times, including when he was asked about the alleged comparators in his EEOC questionnaire, whether he lied under oath in the Sanderson Farms case, whether he had ever sought money under false pretenses, whether he had filed lawsuits other than the one against Sanderson Farms, and in response to several questions about the damages alleged in this case. (*Id.* at ¶¶ 81–84, 86–87.)

## II.  Discussion

Scott brings this action alleging his discharge was in violation of the Americans with Disabilities Act (ADA). The ADA prohibits employers from discriminating against "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a). When a plaintiff attempts to prove a disability discrimination claim with circumstantial evidence, as Scott does, courts employ the *McDonnell-Douglas* burden-shifting analysis from Title VII cases. *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). To establish a *prima facie* case of disability discrimination, the plaintiff must show that (1) he has a disability, (2) he was qualified for the job, (3) and that he was discriminated against because of his disability. *Greenberg v. Bellsouth Telecomms, Inc.*, 498 F.3d 1258, 1264 (11th Cir. 2007). Once the plaintiff establishes his *prima facie* case, the employer must articulate a legitimate, non-discriminatory

reason for the challenged action. *Wascura*, 257 F.3d at 1242. The plaintiff then must produce evidence to permit a reasonable factfinder to conclude that the employers' preferred reasons for the adverse action were a pretext for discrimination. *Id.*

### A. Scott's Qualification for the Position

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Scott now asserts he is such an individual, *see* Doc. 46 at 7, but that assertion is a new one. In his claim for disability benefits, Scott averred that he had "totally incapacitating symptoms." The more extensive claim was required in the social security context, as benefits are only available to those who are "unable to do [their] previous work . . . ." 42 U.S.C. § 423(d)(2).

The doctrine of judicial estoppel is implicated in circumstances such as these. Born in equity, the doctrine "precludes a party from asserting a . . . position that contradicts or is inconsistent with a prior position taken by the same party." 18 James Wm. Moore et al., Moore's Federal Practice ¶ 131.13[6][a] (3d ed. 2016). "In the Eleventh Circuit, courts consider two factors in the application of judicial estoppel to a particular case. 'First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system.'" *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting *Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260 F.3d 1302, 1308 (11th Cir. 2001)).

In *Talavera v. Sch. Bd. of Palm Beach Cty.*, 129 F.3d 1214 (11th Cir. 1997), the Eleventh Circuit considered the circumstances presented here: whether a claimant's statement that he was totally disabled during a social security proceeding estopped him from then claiming he was a qualified individual under the ADA. The Court held that the two assertions were not inherently inconsistent. *Id.* at 1220. An individual could be a qualified individual under the ADA because he is able to perform the job's essential functions with reasonable accommodations, but still be unable to do his previous work without those accommodations—which is all that is required for social security benefits. *Id.*; *compare* 42

8

U.S.C. § 12111(8) *with* 42 U.S.C. § 423(d)(2). Accordingly, no per se rule of judicial estoppel was justified. However, the Court also held that a claimant is estopped from denying the truth of any statements made in his disability application. *Talavera*, 129 F.3d at 1220. And "[w]hether in any particular situation there is an inconsistency between applying for SSD benefits and bringing an ADA claim will depend upon the facts of the case, including the specific representations made in the application for disability benefits and the nature and extent of the medical evidence in the record." *Id.*

Two years later, the United States Supreme Court came to a similar conclusion, holding that "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). However, the Court limited its holding to those cases in which a plaintiff succeeded in his request for social security benefits. "[I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Id.* at 805.

Scott is not estopped from claiming to be a qualified individual in this action because of the *Cleveland* carve-out: he was not successful in asserting he was completely disabled in his social security action. As the Supreme Court noted in *Cleveland*, "[o]ur ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to 'set forth two or more statements of a claim or defense alternately or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'" *Cleveland*, 526 U.S. at 805 (quoting Fed. Rule Civ. Proc. 8(e)(2)). The Supreme Court—and this Court—"do not see why the law in respect to the assertion of SSDI and ADA claims should differ." *Id.*

Target again misses the mark when it next argues that Scott's claim should be dismissed because he "testified that he could not work on the 86 machine and he pled the Fifth Amendment when asked whether he was currently able to work at all." (Doc. 41-1 at 10.) The tense of Target's statement implies Scott admitted he was unable to work on the 86 machine at the time he was employed with Target. In reality, Scott was admitting he was

9

unable to work on the 86" machine at of the day of his deposition—June 27, 2016. (Doc. 41-2 at 128:4–6.) Scott had been involved in three additional car accidents between the time of his separation with Target and his deposition. His testimony on his ability to work seven years after that separation—particularly given the number of additional accidents—is not relevant in determining whether he was a qualified individual in 2009. Any adverse inference regarding his ability to work generally in 2016 would similarly be irrelevant.

In its reply brief, Target pivots and (for the first time) argues that Scott's ability to work in 2016 is relevant to the amount of back pay he would be owed were Target found liable in this case. But the amount of damages to which Scott may be entitled has nothing to do with Target's conclusions that "Plaintiff's Disability Claim Should Be Dismissed Because He Cannot Demonstrate He Is a Qualified Individual With a Disability" (Doc. 41-1 at 10) and that "Plaintiff Cannot Demonstrate That He Is a Qualified Individual with a Disability" (Doc. 47 at 4). The amount of damages owed is not an element of a *prima facie* case. *See Greenberg*, 498 F.3d at 1264. Moreover, "this Court does not review arguments raised for the first time in a reply brief." *United States v. Parnell*, 32 F. Supp. 3d 1300, 1304 (M.D. Ga. 2014).

Accordingly, Target has not put forth any argument upon which the Court could conclude Scott failed to establish a *prima facie* case of disability discrimination when construing the evidence in his favor.[5]

### B. The Court's Inherent Powers to Manage Its Cases

Target next argues that the Court should dismiss the case through its inherent power to punish and deter abuses of the judicial process on three bases: (1) the inconsistency between Scott's testimony in this case and how he testified when attempting to obtain social security benefits, as discussed above; (2) the inconsistency between Scott's testimony at his deposition that he earned income after his separation with Target and the payment records with the Department of Labor which indicate he did not earn any income; and (3) Scott's request for lost wages without deductions for that earned income. (Doc. 41-1 at 14.)[6]

---

[5] Given this conclusion, the Court need not consider whether Scott can create an issue of material fact through Target's alleged failure to engage in the interactive process—another issue briefed by the Parties.
[6] The request for a court to invoke its inherent powers is more commonly a standalone request for a sanction rather than an argument in a summary judgment motion. *See, e.g.*, *Purchasing Power, LLC v. Bluestem Brands, Inc.*,

10

The Court's authority to dismiss on these bases, Target asserts, is that described in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). In examining *Chambers*, the Eleventh Circuit has noted that:

> Courts have the inherent power to police those appearing before them. A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." This power "must be exercised with restraint and discretion" and used "to fashion an appropriate sanction for conduct which abuses the judicial process." A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." The dual purpose of this power is to vindicate judicial authority without resorting to a contempt of court sanction and to make the prevailing party whole. The key to unlocking a court's inherent power is a finding of bad faith.

*Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citations omitted). Target has failed to make an adequate showing that Scott acted in bad faith.

As the Court has discussed earlier, Scott's testimony which was inconsistent with that at the social security proceeding "is of the sort normally tolerated by our legal system." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. at 805. The Court will not dismiss the action on that basis. Second, Scott has testified to the income he earned after his separation from Target. Whether that income was reported to the Department of Labor—and whether the failure to do so constitutes a crime—is beyond the realm of this case and the answers unneeded to resolve the instant claim.

Third, merely bringing a claim that Target asserts is not meritorious is not necessarily a "bad faith" claim. The Court notes that Scott's complaint was filed *pro se*. Scott may not have understood which damages were recoverable and which were not. There is no basis for asserting his claim was made in bad faith.[7]

---

851 F.3d 1218, 1222 (11th Cir. 2017). However, the distinction makes no practical difference here. None of the facts Target relies on are in any way contested. The Parties only disagree on the legal impact of those facts. (*Compare* Doc. 41-1 at 13–17 *with* Doc. 46 at 14–17.)

[7] Target also cites *Baker v. Alderman*, 158 F.3d 516 (11th Cir. 1998) for the proposition that "[m]aintaining positions that are clearly contrary to the law demonstrates bad faith and a lack of respect for the judiciary." *Baker* was a Rule 11 case with a different set of standards from those at issue here. Because Target's motion is one for summary judgment, the Court will not consider any arguments for Rule 11 sanctions. *See* Fed. R. Civ. P. 11(c)(2).

Target also takes issue with the number of times Scott invoked his Fifth Amendment rights during his deposition and asks the Court to dismiss the case on that ground. "The plaintiff who retreats under the cloak of the Fifth Amendment cannot hope to gain an unequal advantage against the party he has chosen to sue." *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 (5th Cir. 1979).[8] "[H]owever, dismissal may only be used as a remedy of last resort where the plaintiff's refusal to submit to discovery is based on his exercise of a constitutional right." *Id.* at 1087 n.6. "Courts must balance the relative weights of the parties' competing interests to see 'that the rights of both parties are taken into consideration before the court decides whose rights predominate.'" *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1305 (11th Cir. 2009) (quoting *Wehling*, 608 F.2d at 1088).

Target's complaints of areas where Scott has invoked his Fifth Amendment privilege do not justify the extreme sanction of dismissal when balanced against Scott's constitutional rights.

First, Target claims "Plaintiff refused to testify about whether he is able to work at all and whether he has been unable to work at the time of or any point following his termination." (Doc. 41-1 at 15.) Target exaggerates the evidence. It cites Statement of Fact paragraph eighty-nine for this proposition. That statement, in turn, cites Scott's deposition at page 128[9] wherein he invoked the privilege when asked, "[d]o you believe you can work at all with your *current* injuries and health issues?" As discussed earlier, Scott's ability to work at the time of his deposition is only relevant to the amount of damages which may be recoverable. Weighing the interests of the parties, then, it would be inequitable to dismiss the case outright when Target is unable to acquire evidence which, at its best, would only reduce its potential liability. Target may wish to propose some other sanction or form of relief in the future. However, in this Motion, it has only requested a complete dismissal and proposed nothing less.

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[9] Target actually cites Scott's deposition at page 117. Page 117 of the deposition is marked page 128 of Document 41-2. For the sake of consistency, the Court uses its own page numbering for citations to all documents.

12

Second, Target objects to Scott's alleged unwillingness to provide testimony about his alleged comparators. (Doc. 41-1 at 15.) Scott claimed in his EEOC intake questionnaire that "[p]eople run [sic] orders wrong a week after my termination and wasn't [sic] written up[,] reprimanded or nothing." (Doc. 41-2 at 94:22–25.) Scott then refused to answer how he was aware of that fact. (*Id.* at 95:5–6.) However, Scott later admitted he had no personal knowledge of the alleged policy violations. (*Id.* at 95:7–21.) Presumably then a hearsay objection would be more than adequate to prevent Scott from presenting this evidence to a jury. The Court cannot conceive of any prejudice to Target from being unable to explore the context of a piece of evidence which cannot be presented to a jury. No sanction is needed to protect Target's rights.

Third, Target complains that Scott refuses to answer questions about an alleged insurance fraud conviction allegedly arising from staged car accidents. It asserts that as a result it is unable to conduct discovery as to whether the April 2008 accident giving rise to this lawsuit was also staged. (Doc. 41-1 at 15–16.) But Target does not explain why 42 U.S.C. § 12112(a) would exclude anyone from the ambit of its protection based on the origin of his or her disability. Whether the April 2008 accident was staged does not appear relevant to this action. The only relevant and ultimate question is whether or not Scott was disabled.

Fourth, Target alleges it was unable to conduct discovery on whether Scott mitigated his damages because he refuses to state whether he reported his cash earnings from Gibson Auto to the IRS. (Doc. 41-1 at 16.) But Target *has* been able to conduct discovery related to Scott's earnings. It is undisputed that, as part of another proceeding, Scott submitted sworn testimony that he earned approximately $200 per week from Gibson Auto. (Doc. 46-1 at ¶ 47.)

Fifth, Target again complains of Scott's inconsistent statements to the social security administration. (Doc. 41-1 at 16.) That issue has already been addressed repeatedly herein and is unavailing.

Sixth, Target objects to Scott asserting his Fifth Amendment privilege when asked whether he has ever sought money under false pretenses. (*Id.*) It is unclear why Target believes Scott should be forced to answer whether he has *ever* committed a particular

13

uncharged crime. Requiring such an answer would be highly prejudicial to him and outweigh any evidentiary value in this case.

Seventh, Scott refuses to testify as to whether he ever operated machinery at Target while under the influence of cocaine. (Doc. 46-1 at ¶ 85.) Target asserts the evidence is relevant to its after-acquired evidence defense. (Doc. 41-1 at 16.) The after-acquired evidence doctrine limits the damages an employer owes for a discriminatory firing if it can show it would have terminated the employee for a wrongdoing—here, allegedly operating machinery while under the influence of cocaine—had it been aware of the wrongdoing at the time of the termination. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 361–62 (1995). However, the defense does not act as a total bar to recovery. *See Bailey v. TitleMax of Georgia, Inc.*, 776 F.3d 797, 804 (11th Cir. 2015). And again, it would be inequitable to dismiss that case outright where Target only argues Scott's invocation of the Fifth Amendment should reduce the damages he may be owed.

Similarly, Target complains that Scott refuses to testify as to the emotional distress he allegedly endured from his separation with Target. (Doc. 41-1 at 16.) Again this goes to the measure of damages and an outright dismissal would be inequitable. Additionally, it is unclear what prejudice is caused to Target. Scott will not be able to show any harm based on emotional distress if he is unwilling to tender any evidence as to the damage it caused him.

Accordingly, there is no basis to dismiss the action based on Scott's invocation of the Fifth Amendment.[10]

### C. Workers' Compensation

Target next asks the Court to dismiss Scott's claim for damages related to his shoulder injury on the basis that Georgia's workers' compensation law provides the sole remedy. *See* O.C.G.A. 34-9-11(a). The Court is aware that in a previous discovery request, Scott represented to Target that it was seeking damages related to Scott's surgery on his right shoulder. (*See* Doc. 34-1.) On that basis, the Court permitted Target to amend its answer to

---

[10] The Court assumes, for the sake of this motion, that Scott's Fifth Amendment privilege was properly invoked in response to each of these questions. Target could have, but did not, seek to compel a response from Scott if it believed the Fifth Amendment did not apply to a particular question.

add an additional defense. (Doc. 35.) However, the Court has never found that Scott properly alleged a claim related to his shoulder injury.

Scott's complaint is quite clear. While drafted *pro se*, it states that the only act he complains of in the suit is the "[t]ermination of [his] employment" and that his claim is for discrimination in violation of the "(ADA) American with Disability Act." (Doc. 1 at 2.) The relief he requests is "recovery of back pay[,] reinstatement to my former job or positions[,] front pay . . .[,] injunctive relief[, and] expenses and attorney's fees." (*Id.* at 4.) The box where a claimant can check to request "damages" is not checked. (*Id.*) Nowhere in the complaint does Scott mention any other cause of action or relief requested. (*See generally* Doc. 1.) Once represented by counsel, Scott never amended his complaint and the deadline to do so has passed. (Doc. 19 at 2.) The Court finds that Scott has not alleged a claim related to his surgery, and thus, there is no claim to dismiss.

### D. Scott's Noncompliance with the Local Rules

Target's Motion for Summary Judgment was filed on September 12, 2016. (Doc. 41.) Scott's response was due on October 3, 2016. *See* M.D. Ga. L.R. 7.2. On October 3, 2016, Scott submitted a response that was twenty-three pages long, in violation of Local Rule 7.4. (Doc. 45.) The Clerk of Court noticed Scott that his brief was deficient. (*See* Docket.) The following day, Scott resubmitted a brief in compliance. (Doc. 46.) Though technically Scott's brief was thus filed a day late, the Court finds no prejudice to Target and therefore no sanction is warranted. *See Gullock v. Spectrum Scis. & Software, Inc.*, 146 F. Supp. 2d 1364, 1372 (M.D. Ga. 2001). However, in the future the Court expects Scott to comply with all local rules.

For all the reasons discussed herein, the Court finds that genuine and material issues of fact remain. Accordingly, Target's Motion for Summary Judgment is **DENIED**.

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Court outlines below the undisputed facts presented by Scott in support of his Motion. However, many of the statements listed by Scott as "undisputed" are in fact disputed by other testimony or exaggerated accounts of undisputed testimony. (*See generally* Doc. 44.) It is Scott's burden to show there are no genuine issues of material fact by making

15

reference to the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court then only considers the evidence properly supported by the record.

**I.      Relevant Factual Background**

Quentin Sims was Scott's immediate supervisor at Target. (Doc. 43-2 at ¶ 1.) Gary Gilbert in turn was the production manager, which made him second-in-charge. (*Id.* at ¶ 9; 43-3 at 53:5–6; 43-5 at 15:18–25.) Employee hires and terminations at Target's Albany plant go through him. (Doc. 43-2 at ¶ 9.) The supervisors are also involved in the approval process for receiving time off. Doctors' notes and requests for time off normally go to Gilbert. (Doc. 43-2 at ¶ 4; 44-1 at ¶ 4.) At least some of Scott's doctors' notes and time off requests were given to Gilbert. (Doc. 43-2 at ¶ 5; Doc. 44-1 at ¶ 5.)

Scott was injured in a car accident in April 2008. (Doc. 43-2 at ¶ 20.) At some point, Gilbert learned of the accident and told Sims. (*Id.* at ¶ 6; Doc. 44-1 at ¶ 6.) Sims was skeptical of Scott's alleged injuries and told Scott there was nothing wrong with him. (Doc. 43-2 at ¶ 35.) Gilbert informed Sims that Scott would be taking time off for doctor visits—which Scott did. (*Id.* at ¶¶ 7, 21; 44-1 at ¶ 21.) Scott's injuries included cervical spondylosis, osteoarthritis of the cervical spine, and bilateral shoulder impingement syndrome. (Doc. 43-2 at ¶ 22.) Scott's doctor requested that he be put on light duty, but there is conflicting evidence as to whether that request was ever given to Gilbert. (*Id.* at ¶ 24; Doc. 43-5 at 98:16–18.) Scott at least sometimes gave his medical documents to Gilbert. (Doc. 43-4 at 13–20.)

As discussed above, Target is in the business of producing boxes. A supervisor is supposed to sign off on every test box produced before an order runs. (Doc. 43-3 at 60:17–20.) One machine in the Albany plant is the 86" Universal Rotary Printer Slotter. The machine generally, but not always, has a machine operator and a helper. (Doc. 43-2 at ¶ 10; Doc. 44-1 at ¶ 10.) The 86" is the largest machine at Target's Albany plant. (Doc. 43-2 at ¶ 11.) Gilbert and Sims are familiar with the working instructions for the 86" machine which assigns responsibilities to both the operator and the helper. (Doc. 43-2 at ¶¶ 12–13; 44-1 at ¶¶ 12–13.) Target wants its employees to follow the working instructions. (Doc. 43-2 at ¶ 14.)

Scott was promoted to the 86" in July 2008 by Gilbert. (Doc. 43-2 at ¶ 15.) From October 2008 to April 2009, after the April 2008 car accident, Scott worked on the 86" machine by himself at times. (Doc. 43-2 at ¶ 16; 44-1 at ¶ 16.) Scott had generally requested help from Sims on the 86". (Doc. 43-2 at ¶ 31.) Whenever Scott was working without a helper, Sims assisted him as needed. (Doc. 43-4 at 101:8–10.) Sims did hire or reassign a helper to Scott on two occasions. (*Id.* at 100:9–14.) Scott requested to return to his previous position as a baler but was told he was needed on the 86" machine. (Doc. 43-2 at ¶ 37.) Scott was qualified to work a forklift as well. (*Id.* at ¶ 38; *see* Doc. 43-4 at 191:20–23.)

Scott informed his supervisors at Target of his need for surgery related to the accident on March 29, 2009. (Doc. 43-3 at 83:16–19.) Scott requested short-term disability forms from Sims and Tania Hammack, and it took over a month to get them. (*Id.* at 146:10–13, 149:11–15.) Scott provided a letter from Albany Arthritis and Orthopedic Center detailing his torn rotator cuff and the need for surgery and physical therapy. The letter also states that Scott would be out for six-to-eight weeks beginning May 1, 2009. (Doc. 43-2 at ¶ 28.) Seven days after providing the letter and one day before the leave was scheduled to begin, Scott was written up for running an incorrect order and terminated. (*Id.* at ¶¶ 29; 47.) The write-up occurred twenty-nine days after the alleged infraction. (*Id.* at ¶ 52.) On at least some prior occasions, employees with quality issues were written up within one day of the alleged infraction. (*Id.* at ¶ 51.)

Prior to the termination, Scott received satisfactory work evaluations during his employment with Target. (*Id.* at ¶ 39.) In 2007, the evaluations listed him as "very knowledgeable about his machine" and stated he was "Good/Fully Competent" in the quality assessment. (*Id.*) He was a hard worker and good employee. (*Id.* at ¶¶ 40, 42.) Prior to his April 2008 car accident, he had no write-ups in his file. (*Id.* at ¶ 44; 44-1 at ¶ 44.)

Target provides an employee handbook for all its employees upon their hire. (Doc. 43-2 at ¶ 48.) The guidelines provide that, in general, an employee violating a policy is first given a verbal warning, then a written warning for a second offense, a three-day suspension for the third, and is terminated upon the fourth offense. (*Id.* at ¶ 49; 44-1 at ¶ 49.) However,

Target retains the right to terminate employees after the first violation. (Doc. 43-5 at 104:4–14.)

Robert Clay was a press/machine operator at Target. (Doc. 43-2 at ¶ 54.) He had five quality issues, but was not written up until his fourth. (*Id.* at ¶¶ 55–56.) Oliver Smith was a press/machine operator and violated company policy two times in a two-month period. (*Id.* at ¶ 59.) He received nothing more than written warnings. (*Id.*) Fabian Brown was written up twice in one year for violating company policy. (*Id.* at ¶ 60.) He was warned that another quality issue would result in suspension. (*Id.* at ¶ 61.) He received another write-up and was not terminated. (*Id.*) Gilbert was only aware of Scott and one other Target employee who had been fired for quality issues. (Doc. 43-5 at 132:1–9.)

## II. Discussion

Scott moves for "perhaps the unlikeliest outcome in an employment-discrimination case: summary judgment for the plaintiff." *Calhoun v. EPS Corp.*, 36 F. Supp. 3d 1344, 1354 (N.D. Ga. 2014). Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991)). Ultimately, for Scott's claim to succeed, a reasonable jury will have to conclude Target's decision to terminate Scott was motivated by his disability. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004). Scott's success on this motion therefore depends on his ability to show that no reasonable jury could find Target was not motivated by Scott's disability when terminating him.

Scott devotes his entire brief in support of his motion to show that he has established a *prima facie* case of disability discrimination. To establish a *prima facie* case, the plaintiff must show that (1) he has a disability, (2) he was qualified for the job, (3) and that he was discriminated against because of his disability. *Greenberg v. Bellsouth Telecomms, Inc.*, 498 F.3d 1258, 1264 (11th Cir. 2007). The standard is the first step in the *McDonnell-Douglas* burden shifting regime which is designed to "'eliminate[ ] the most common nondiscriminatory

reasons for the plaintiff's rejection,' and to 'forc[e] the defendant to come forward with some response.'" *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)). Once the plaintiff has established a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). Here, Target has done so. It is undisputed that Target asserts it terminated Scott for quality issues.

In cases where a defendant files a motion for summary judgment, the burden would then return to the plaintiff to show that the defendant's reasons were a pretext. *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). The returning burden tracks the standard for summary judgment: the plaintiff must produce evidence showing that a reasonable jury could conclude that the employer's stated reason was untrue. But here, on a plaintiff's motion, Scott must show not that a reasonable jury could find Target's stated reason untrue, but that no reasonable jury could conclude the stated reason was true. The burden is a heavy one. *See Nicholas Acoustics & Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 844 (5th Cir. 1983).

Scott does not address whether Target's stated reason is a pretext in his brief. However, he does allege that other similarly-situated employees were not terminated after they were written-up for quality violations. Such comparators may be used to demonstrate a strong enough implication of pretext to survive a defendant's motion for summary judgment. *See Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 812 (11th Cir. 2014). But here, the script is flipped. Construing the evidence in Target's favor, Scott ran an incorrect order and was terminated for it—as was allowed by company policy. Scott identifies other employees who were not terminated after quality violations, but presents no evidence as to how their violations compared to those of Scott's. That leaves the parties in a credibility contest: a jury could choose to believe Target's stated reasons for Scott's termination or that, given how unusual a quality-related termination was at Target, its true reason was because of his alleged disability.

19

"Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012). The Court assumes, without making a finding, that for the purposes of this motion that Scott has established a *prima facie* case of discrimination. Even so, Target has proffered a non-discriminatory reason for Scott's termination. A reasonable jury could find Target's explanation credible, even given Scott's circumstantial evidence of pretext. Accordingly, Scott's Motion for Summary Judgment is **DENIED**.[11]

## CONCLUSION

For this reasons given herein, Defendant Target Container Company's Motion for Summary Judgment (Doc. 41) is **DENIED**. Likewise, Plaintiff Frankie Scott's Motion for Summary Judgment (Doc. 43) is **DENIED**. This case will proceed to trial as outlined in the Court's August 14, 2017 Notice of Pretrial Conference. (Doc. 48.)

**SO ORDERED**, this 16th day of August, 2017.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[11] Because the Court decides the motion on this basis, it need not consider Target's alternative grounds for a denial. (*See* Doc. 44 at 2–17.)